## TEXAS *v*. HARDENBERG.

1. Under a bill by a State praying that a defendant may be enjoined from asking payment of certain United States bonds belonging to it, unlawfully taken some time before from its treasury, and now redeemable, *and for such other and further relief as the court may deem proper*, equity will follow a substituted security (new bonds bearing interest) given by the United States; the substitution having been made after the issue of process under the bill, though before service, by agreement between the holder of the bonds and the United States, in order that the party properly entitled, whoever he might be finally under the bill decided to be, should not lose interest; and the new bonds being held by a trustee for this purpose.
2. A party buying bonds of the United States with overdue and unpaid coupons, is to be taken as affected with knowledge of prior equities when he purchases them after the date when they are redeemable, and for which the coupons run, knowing that the government, paying promptly all its bonds generally, objects at that time to redeeming these, and does not in fact redeem them or the overdue coupons, and where notice has been given in public papers of great circulation that payment of the bonds was forbidden, and that there was difficulty about them.

THIS case, which, in its principal aspect, has been already reported,* was now here upon an additional part of it, and

* 7 Wallace, 700.

under an order made when the main decree was given for further hearing on that additional part, if such hearing should be demanded. The case as presented by that part— a presentation of which, in a full and consecutive way, makes necessary a repetition of some parts of the original case—was thus:

In 1851, the United States issued five thousand bonds for $1000 each, and numbered successively from No. 1 to No. 5000, to the State of Texas. The bonds, which were dated January 1st, 1851, were coupon bonds, payable, by their terms, to the State of Texas or *bearer*, with interest at five per cent. semi-annually, and *"redeemable after the 31st day of December*, 1864." Each bond contained a statement on its face that the debt was authorized by act of Congress, and was *" transferable on delivery,"* and to each were attached six-month coupons, extending to December 31, 1864, but no further.

In pursuance of an act of the legislature of Texas, the controller of public accounts of the State was authorized to go to Washington, and to receive there the bonds; the statute making it his duty to deposit them, when received, in the treasury of the State of Texas, to be disposed of *"as may be provided by law;"* and enacting further, that no bond, issued as aforesaid and payable to bearer, should be "available in the hands of *any* holder until the same shall have been indorsed, *in the city of Austin, by the governor of the State of Texas."*

Most of the bonds were indorsed and sold according to law, and purchased in or paid by the United States prior to 1860. A part of them, however, appropriated by act of legislature as a school fund, were still in the treasury of Texas, in January, 1861, when the late Southern rebellion broke out. Texas was one of the rebel States; and the part which she took in the rebellion is sufficiently known. In the particular matter of this case, the legislature of the State, immediately after its so-called " ordinance of secession " was passed, directed the rebel military board of the State to dispose of any bonds and coupons which may be in the treasury

on any account, and use such funds or their proceeds for the defence of the State; and repealed the act which made an indorsement of the bonds by the governor of Texas necessary to make them available in the hands of the holder.

Under these acts, the military board, on the 12th January, 1865, a date at which the success of the Federal arms seemed probable, agreed to sell to White & Chiles a large number of these bonds, then in the treasury of Texas, and the bonds were delivered to White & Chiles on the 15th March following, *none of them being indorsed by any governor of Texas.*

In February, 1862, after the rebellion had broken out, the Secretary of the Treasury of the United States was informed by the Hon. G. W. Paschal, a loyal citizen of the State of Texas, that an effort would be made by the rebel authorities of Texas to use the bonds remaining in the treasury in aid of the rebellion; but that they could be identified, because all that had been circulated before the war were indorsed by different governors of Texas. The Secretary of the Treasury acted on this information, and refused in general to pay bonds that had not been indorsed. On the 4th of October, 1865, this same gentleman acting as an agent of the State of Texas, caused to appear in the money report and editorial articles of the New York Herald, a notice of the transaction between the rebel government of Texas and White & Chiles, and a statement that the treasury of the United States would not pay the bonds transferred to them by such usurping government. In addition to this, on the 10th October, 1865, the provisional governor of the State published in the New York Tribune, a " *Caution to the Public,*" in which he recited that the rebel government of Texas had, under a pretended contract, transferred to White & Chiles " one hundred and thirty-five United States Texan indemnity bonds, issued January 1, 1851, payable in fourteen years, of the denomination of $1000 each, and coupons attached thereto to the amount of $1287.50, amounting in the aggregate, bonds and coupons, to the sum of $156,287.50." His caution did not specify, however, any particular bonds by number. The

caution went on to say that the transfer was a conspiracy between the rebel governor and White & Chiles to rob the State treasury, that White & Chiles had never paid the State one farthing, that they had fled the State, and that these facts had been made known to the Secretary of the Treasury of the United States. And "a protest was filed with him by Mr. Paschal, the agent of the State of Texas, against the payment of the said bonds and coupons unless presented for payment by proper authority." The substance of this notice was published in money articles of various newspapers of about that date, and men in New York and other places, dealing in stocks, spoke to the agent who had caused it to be inserted in the Tribune, about it. It was testified also, that after the commencement of the suit, White & Chiles said that they had seen it.

The rebel forces being disbanded on the 25th May, 1865, and the civil officers of the usurping government of Texas having fled from the country, the State of Texas, on the 15th February, 1867, filed, with the leave of the court, a bill against White & Chiles, one Hardenberg, and some other persons, as defendants, on account of these bonds.

The bill set forth the issue and delivery of the bonds to the State, the fact that they were seized by a combination of persons in armed hostility to the government of the United States, sold by an organization styled the military board, to White & Chiles, for the purpose of aiding the overthrow of the Federal government; that White & Chiles had not performed what they agreed to do ; that they had transferred such and such numbers, specifying them, to Hardenberg, and such and such others to different persons named; that these transfers were not in good faith, but were with express notice on the part of the transferees of the manner in which the bonds had been obtained by White & Chiles; that the bonds were overdue at the time of the transfer; and that they had never been indorsed by any governor of Texas; that they were placed in the hands of the defendants holding them, for the purpose of collecting the proceeds from the United States; and that the defendants designed to collect

the proceeds and apply the same to their own use, in disregard of the just rights, and to the great loss and injury of the complainant. And one of the interrogatories required from each defendant, except White & Chiles, to whom somewhat different interrogatories were addressed, a statement whether any other person was interested in any, and, if any, in which of the bonds, or the proceeds thereof.

The prayer of the bill was for an injunction against the defendants or any of them *asking, or receiving payment of the bonds from the United States,* and that the *bonds* might be delivered to the State of Texas; and for *other and further relief as to the court should seem fit and proper.* On the same 15th of February, 1867, that the bill was filed, a motion for injunction was made, and it was ordered to be set down for hearing on the 2d of May following, and that copies should be served on the defendants at least ten days before. Process and subpœna were issued forthwith and served; the service on Hardenberg being made February 27th. He filed his answer May 15th, and on the 16th, the motion for an injunction was granted with leave to the defendants to move to dissolve it at December Term, 1868. The dates are important, as will appear in connection with other dates hereafter stated.

The different defendants answered, and evidence having been taken and the cause argued, a decree was entered affirming the jurisdiction of the court (of which a denial had been made, and which was a main point argued), and finding that the contract of the 12th of January, 1865, between White & Chiles and the military board of Texas, was null and void; and that the indemnity bonds, received by the State from the United States, and transferred under that contract to White & Chiles, remained the property of the State notwithstanding that transfer.

The decree further found that the State of Texas was entitled to recover any of the bonds and coupons, or any proceeds thereof, which had come to the possession of any other defendants than White & Chiles, with notice of the equity of the complainant, and perpetually enjoined Hardenberg,

with other defendants, from setting up any claim or title to any of the bonds and coupons, or proceeds, which had come into their possession and control with such notice.

It was further decreed that certain defendants were accountable to make restitution of the bonds and the proceeds received by them; but it appearing that Hardenberg, before the commencement of this suit, had deposited thirty-four bonds with the Secretary of the Treasury, and now alleged that he had *received payment from the United States before the service of process, it was ordered that the counsel of those parties should be further heard in respect to such payment and the effect of it.*

It was this matter, therefore, a sequel, as already said, of the main case, which made the chief subject of the present hearing; re-argument being also, in fact, allowed on a point argued on the hearing of the main case,—how far Hardenberg was a holder *bonâ fide*, for value and without notice, of the bonds held by him.

The case, as respects both these points, was thus:

1. *As to the effect of the payment.*—The answer of Hardenberg to the bill filed by the State of Texas, stated, that " on the 16th of February, 1867, the Secretary of the Treasury ordered the payment to the respondent of all said bonds and coupons, and the *same were paid* on that day." That the *bonds* had been taken up was true; and the *books of the treasury* showed them as among the redeemed bonds; and showed nothing else. As a matter of fact, however, and as regarded the matter of a *payment*, the case was not so clear. It appeared that the agents of Texas, on the one hand, had been urging the government not to pay the bonds, and that Hardenberg, on the other (who had been advised by Mr. Tayler, December 17th, 1866; that payment was delayed in order that information might be got from Texas), was pressing for payment; it being insisted by him, as also by other bondholders who were pressing for payment of their bonds, that the United States had no right to withhold the money, now overdue, and ceasing to draw interest. The Controller of the Treasury, Mr. Tayler, in this state of things, made a

report, on the 29th of January, 1867, to the Secretary of the Treasury, in which he mentioned, that it seemed to be agreed by the agents of the State, that her case depended on her ability to show a want of good faith on the part of the holders of the bonds; and that he had stated to the agents, that as considerable delay had already been incurred, he would, unless during the succeeding week they took proper legal steps against the holders, feel it his duty to pay such bonds as were unimpeached in title in the holders' hands. He accordingly recommended to the secretary payment of Hardenberg's and of some others. The agents, on the same day that the controller made his report, and after he had written most of it, informed him that they would take legal proceedings on behalf of the State; and were informed in turn that the report would be made on that day, and would embrace Hardenberg's bonds. Two days afterwards (January 31st, 1867), a personal action was commenced, in the name of the State of Texas, against Mr. McCulloch, the then Secretary of the Treasury, to compel the detention of the bonds of Hardenberg and others. On the 8th of February, Mr. Tayler informed Hardenberg that *his* bonds had been reported to the secretary, with a recommendation that they be paid; but that while the clerk in the secretary's office, according to the usual practice, was preparing a statement, the personal action above referred to had been commenced against Mr. McCulloch for the detention of the bonds, and that "this of course compelled the secretary to postpone the payment." This personal action was dismissed February 19th. On the 15th of this same February, as already stated, the present bill was filed. On the 16th of the month, *no process under the present bill having then, nor until the* 27*th following, been served on Hardenberg,* Mr. Tayler, Controller of the Treasury, and one Cox, the agent of Hardenberg, entered into an arrangement, by which it was agreed that this agent should deposit with Mr. Tayler government notes known as "seven-thirties," equivalent in value to the bonds and coupons held by Hardenberg. The seven-thirties were then delivered to Mr. Tayler, and a check in coin for the amount of the bonds and

interest was delivered to Hardenberg's agent. The seven-thirties were subsequently converted into the bonds called "five-twenties," and these remained in the hands of Mr. Tayler, being registered in his name as "trustee." The books of the treasury showed nothing in relation to this trust; nor, as already said, anything more or other than the bonds were paid to Hardenberg or his agent. But a correspondence, referred to in the opinion of the court below, gave the particulars of the transaction. The correspondence was thus:

[TAYLER TO COX.]

WASHINGTON, February 19, 1867.

DEAR SIR : In accordance with the understanding between you and me in relation to the Texan indemnity bonds presented for payment by your client, Mr. Hardenberg, you deposited with me $55,000, in 7-30 Treasury notes, and I advised the secretary to pay you the bonds.

|                                   |           |
| --------------------------------- | --------- |
| You were accordingly paid 34 bonds, . . | $34,000 |
| 170 coupons, . . . . . . . | 4,250 |
| Total in gold, . . . . | $38,250 |

The $55,000 7-30 notes *were deposited with and are held by me as indemnity for Mr. McCulloch against any personal damage, loss, and expense in which he may be involved by reason of the payment of the bonds.*

I believe this states substantially the arrangement, and the cause and condition of the deposit.

I am, very sincerely, yours,

R. W. TAYLER.

HON. S. S. COX, New York.

[TAYLER TO HUNTINGTON.]

WASHINGTON, February 26, 1867.

SIR : Herewith I hand you $55,000 dollars U. S. 7-30 notes, which were delivered to me by S. S. Cox for a purpose explained in my letter to him of the 19th inst. In lieu of these 7-30's I have received from you $55,000, 5-20 registered bonds of 1865, which are taken, as advised by Mr. Cox, and are to be held for

the purpose above referred to.  The bonds are registered in my name as trustee.

I am, very respectfully,

R. W. TAYLER.

W. S. HUNTINGTON,
    Cashier of the First National Bank, Washington.

[TAYLER TO COX.]

WASHINGTON, March 2, 1867.

DEAR SIR: Referring to my letter of the 19th February, to yours of the 20th, and to our conversation a few days since, I have to inform you that W. S. Huntington, cashier of the First National Bank, Washington, placed in my hands $50,000 registered 5-20 bonds of 1865, in lieu of the 7-30's mentioned in my letter, and that I handed the 7-30's to him.  The bonds are registered in my name as trustee, and carry interest from January 1, 1867.

I am, very respectfully,

R. W. TAYLER.

HON. S. S. COX, New York.

Besides these letters, which were exhibits to depositions of Tayler, a letter and memorandum were in the record, being papers addressed by Mr. Tayler, the one to the Chief Justice, in consequence of some inquiry from the Bench, at an early stage of the case, whether the secretary had paid bonds after a bill was filed on the order to prevent payment; the other an explanatory memorandum to counsel.  The letter and memorandum were thus:

[TAYLER TO THE CHIEF JUSTICE.]

TREASURY DEPARTMENT,
WASHINGTON, January 22, 1868.

SIR: In the answer of Mr. Hardenberg, in the case of "The State of Texas *v.* White et al.," it is stated that "on the 16th day of February, 1867, the Secretary of the Treasury ordered the payment to the respondent of all said bonds and coupons, and the same were paid on that day."  I am told the court think this action of the secretary disrespectful toward them; but I am sure nothing disrespectful was intended, and I know that no act of the secretary in relation to these bonds disregarded any order or decree of the court.  In form the bonds were paid; in fact the

proceeds have been withheld from Mr. Hardenberg, because of the legal proceedings, which the secretary did not desire to defeat.

I am, very respectfully,

R. W. TAYLER.

HON. S. P. CHASE, Chief Justice.

[MEMORANDUM GIVEN TO COUNSEL.]

WASHINGTON, January 24, 1868.

The particular form in which the matter of Hardenberg, referred to in my letter of the 22d to the Chief Justice, was arranged, is as follows: At the time, the agent of Hardenberg claimed that the personal action against the secretary having been withdrawn, and the decree enjoining the collection of the bonds not having been served upon Hardenberg, there was no legal objection against the payment of the bonds. The secretary, however, while not disputing this, was not inclined under the circumstances to pay them. It was then insisted that the United States had no right to withhold the money, thus depriving the holder of interest upon it; and upon this suggestion it was arranged that 7-30 notes, equivalent in value to the bonds and interest, should be deposited with an officer of the department to secure the secretary against any claim growing out of the litigation, in whatever shape it might come, and from any censure in the matter. The 7-30's were accordingly deposited, and then a check in coin, for the amount of the bonds and interest, was delivered. This arrangement was not made by Hardenberg in person, but by a gentleman representing him. The 7-30's were subsequently converted into 5-20 bonds, which are in the hands of the same officer.

R. W. TAYLER.

*As to the bona fides, &c.,* the case seemed much thus:

In the beginning of November, 1866, *after the date of the notices given by the State of Texas and her agents, and after the date from which the bonds by their terms were "redeemable," and after which the coupons ran out; some coupons then, of course, overdue and unpaid being on the bonds,* one Hennessey, residing in New York, and carrying on an importing and commission business, sold to Hardenberg thirty of these same bonds,

originally given to White & Chiles; and which thirty, a correspondent of his, long known to him, in Tennessee, had sent to him for sale. Hardenberg bought them "at the rate of $1.20 for the dollar on their face," and paid for them. Hennessy had "heard from somebody that there was some difficulty about the bonds being paid at the treasury, but did not remember whether he heard that before or after the sale."

Hardenberg also bought others of these bonds near the same time, at 1.15 per cent., under circumstances thus testified to by Mr. C. T. Lewis, a lawyer of New York:

"In conversation with Mr. Hardenberg, I had learned that he was interested in the Texan indemnity bonds, and meditated purchasing same. I was informed in Wall Street that such bonds were offered for sale by Kimball & Co., at a certain price, which price I cannot now recollect. I informed Mr. Hardenberg of this fact, and he requested me to secure the bonds for him at that price. I went to C. H. Kimball & Co., and told them to send the bonds to Mr. Hardenberg's office and get a check for them, which I understand they did. *I remember expressing to Mr. Hardenberg the opinion that these bonds, being on their face negotiable by delivery, and payable in gold, must, at no distant day, be redeemed according to their tenor, and were, therefore, a good purchase at the price at which they were offered.*

"My impression is, that *before* this negotiation I had read a paragraph in some New York newspaper, stating that the payment of the whole issue of the Texas indemnity bonds was suspended until the history of a certain portion of the issue, supposed to have been negotiated for the benefit of the rebel service, should be understood. I am not at all certain whether I read this publication before or after the date of the transaction. *If the publication was made before this transaction I had probably read the article before the purchase was made.* My impression is, that it was a paragraph in a money article, but I attributed no great importance to it. I acted in this matter simply as the friend of Mr. Hardenberg, and received no commission for my services. I am a lawyer by profession, and not a broker."

Kimball & Co. (the brokers thus above referred to by Mr.

Lewis), testified that they had received the bonds thus sold, from a firm which they named, "in perfect good faith, and sold them in like good faith as we would any other lot of bonds received from a reputable house." It appeared, however, that in sending the bonds to Kimball & Co., for sale, the firm had requested that they might not be known in the transaction.

Hardenberg's own account of the matter, as declared by his answer, was thus:

"That he was a merchant in the city of New York; that he purchased the bonds held by him in open market in said city; that the parties from whom he purchased the same were responsible persons, residing and doing business in said city; that he purchased of McKim, Brothers & Co., bankers in good standing in Wall Street, one bond at 1.15 per cent., on the 6th of November, 1866, when gold was at the rate of $1.47¼, and declining; that when he purchased the same he made no inquiries of McKim, Brothers & Co., but took the bonds on his own observation of their plain tenor and effect at what he conceived to be a good bargain; that afterwards, and before the payment of said bonds and coupons by the Secretary of the Treasury, and at the request of the Controller, Hon. R. W. Tayler, he made inquiry of said firm of McKim, Brothers & Co., and they informed him that said bonds and coupons had been sent to them to be sold by the First National Bank of Wilmington, North Carolina; that he purchased on the 8th of November, 1866, thirty of said bonds, amounting to the sum of $32,475, of J. S. Hennessey, 29 Warren Street, New York city, doing business as a commission merchant, who informed him that, in the way of business, they were sent him by Hugh Douglas, of Nashville, Tennessee; that he paid at the rate of 120 cents at a time, to wit, the 8th of November, 1866, when gold was selling at 1.46 and declining; that the three other bonds were purchased by him on the 8th of November, 1866, of C. H. Kimball & Co., 30 Broad Street, brokers in good standing, who informed him, on inquiry afterwards, that said bonds were handed them to be sold by a banking house in New York of the highest respectability, who owned the same, but whose names were not given, as the said firm informed him they could 'see no reason for divulging pri-

vate transactions;' and that he paid for last-mentioned bonds at the rate of 120 cents, on said 8th day of November, 1866, when gold was selling at 1.46 and declining.

"Further answering, he saith that he had no knowledge at the time of said purchase, that the bonds were obtained from the State of Texas, or were claimed by the said State; that he acted on information obtained from the public report of the Secretary of the Treasury, showing that a large portion of similar bonds had been redeemed, and upon his own judgment of the nature of the obligation expressed by the bonds themselves, and upon his own faith in the full redemption of said bonds; and he averred that he had no knowledge of the contract referred to in the bill of complaint, nor of the interest or relation of White & Chiles, nor of any connection which they had with said complainant, or said bonds, nor of the law of the State of Texas, requiring indorsement."

The answer of White mentioned, in regard to Hardenberg's bonds, that they were sold by his (White's) broker; that he, White, had no knowledge of the name of the real purchaser, who, however, paid 115 per cent. for them; "that at the time of the sale, his (White's) broker informed him that the purchaser, or the person acting for the purchaser, did not want any introduction to the respondent, and required no history of the bonds proposed to be sold; that he only desired that they should come to him through the hands of a loyal person, who had never been identified with the rebellion."

It appeared further, in regard to the whole of the Texas bonds, the subject of this suit, that, in *June*, 1865, Chiles, wanting to borrow money of one Barret, and he, Barret, knowing Mr. Hamilton, just then appointed provisional governor of Texas, but not yet installed into office, nor apparently as yet having the impressions which he afterwards by his caution made public, went to him, supposing him well acquainted with the nature of these bonds, and sought his opinion as to their value, and as to whether they would be paid. Barret's testimony proceeded:

"He advised me to accept the proposition of Chiles, and gave

it as his opinion that the government would *have* to pay the bonds. I afterwards had several conversations with him on the subject, in all of which he gave the same opinion. Afterwards, (*I can't remember the exact time*), Mr. Chiles applied to Birch, Murray & Co. for a loan of money, proposing to give some bonds as collateral security; and at his request I went to Birch, Murray & Co., and informed them of my conversations with Governor Hamilton, and of his opinion as expressed to me. They then seemed willing to make a loan on the security offered. In order to give them further assurance that I was not mistaken in my report of Governor Hamilton's opinion verbally expressed, I obtained from him a letter [letter produced]. It reads thus:

"NEW YORK, June 25th, 1865.

"HON. J. R. BARRET.

"DEAR SIR: In reply to your question about Texas indemnity bonds issued by the U. S., I can assure you that they are perfectly good, and the gov't will certainly pay them to the holders.

"Yours truly,

"A. J. HAMILTON."

The witness "mentioned the conversations had with Governor Hamilton, and also spoke of the letter, and sometimes read it to various parties, some of whom were dealing in these bonds," and, as he stated, had "reason to believe that Governor Hamilton's opinion in regard to the bonds became pretty generally known among dealers in such paper." The witness, however, did not know Mr. Hardenberg.

*Messrs. Evarts and Carlisle, for Hardenberg:*

1. *As to the effect of the payments.*—When the bill was prepared, and indeed when it was filed, a wholly different state of facts existed from that against which it is *now* sought to have relief. The bonds were then in the hands of Hardenberg, and unpaid. Assuming that he was not a holder *bona fide*, &c., a prayer for injunction against receiving payment was proper, and the only prayer which was proper, or indeed possible. Before, however, any process was served on us, or bound the parties in any way, the bonds were paid and surrendered. A wholly new state of facts arose, and the case assumed by the bill is discovered to have no

existence. And what is now wanted is a bill that shall set forth, along with the former alleged facts of purchase, the fact of payment, substitution, &c., and a prayer to have the substituted securities. Some such bill, in some form, is indispensable, unless we are to violate all rules of equity proceeding. The prayer for general relief cannot be so interpreted as to apply to a state of things which is the reverse of the true state of things, to the state of things alleged in the bill, and to the only state of things which was in the complainant's mind at all. The difficulty of the complainant's case is not that his-bill does not set forth his now case directly and with distinctness, and does not pray for the proper relief in the most specific way; but that it does not set forth his now case at all, nor pray, in any way, relief suitable to _it;_ though it does set out another case, and assuming that case to be true pray proper relief for _it._

The reliance of the other side will have to be on Mr. Tayler's letter to the Chief Justice, and his memorandum to counsel, _after_ he thought that he had made a mistake; an exculpatory paper and memorandum. He had no capacity, when he wrote that letter and made that memorandum, to say what the transaction was in fact as distinguished from form. That is a point to be judged of as a question of law on a view of the thing done.

2. _As to the bona fides, &c._—Hardenberg knew nothing of the bonds except what appeared on their face, and from the published official treasury reports, that similar bonds, of the same issue, had been paid and redeemed at the Treasury of the United States, notwithstanding the secession of Texas, and the civil war and rebellion, which had been suppressed, in point of fact, long before his purchase. He had no knowledge or information that Texas had at any time assumed to alter the terms of the contract of the United States, as expressed on the face of the bonds, so as to expunge from them the express declaration that they were payable to " _bearer_," and the repeated declaration to the same effect, that the bonds passed " _by delivery._" He, therefore, was not affected by the fact that the bonds were not indorsed by the governor

of Texas (if that alteration of the tenor of the bonds had any legal efficacy), and was wholly ignorant that such indorsement had been authorized or required by Texas, for her security against fraud, or for any other purpose.

He had no knowledge or information that the bonds purchased by him had ever been held or claimed by White & Chiles, or either of them; or that any such contract as that set up by the bill had been made. In brief, he was a perfect stranger to all and singular the matters alleged by the bill, as affecting the title to the bonds.

He found them in open market, in the city of New York, in the month of November, 1866, and bought them in good faith, and for their full market value, of brokers and others of high standing, in the usual and regular course of business, not only without knowledge or notice, but without suspicion, or reason to know or suspect, that there was any infirmity in the title of his respective vendors, or any of them.

All this appears by his answer. It is plainly stated, is responsive to the bill, is uncontradicted, and is, therefore, *the case of Hardenberg.*

Against this case, in matter of fact, nothing can be opposed but an alleged constructive notice of the dishonor of the bonds, derived from the language on the face of the instruments, that they were " redeemable after the 31st day of December, 1864," which day had passed when he purchased; and the further fact that there were unpaid and overdue coupons attached to the bonds. This, it will no doubt be insisted, for the complainant opens the bonds in the hands of Hardenberg " to all equities," and lets in the complainant to the relief claimed by the bill.

That coupon bonds, payable to bearer, are negotiable securities, passing by delivery, like bank notes, and that the possession is sufficient evidence of title, and that nothing short of knowledge of the infirmity of title, even in the case of *stolen* bonds of this description, will defeat the title of a *bonâ fide* purchaser for value, is now settled.*

---

* Murray v. Lardner, 2 Wallace, 110.

Will it be insisted for the complainant, that when Hardenberg purchased these bonds they were *overdue*, and that this circumstance defeats his title?

Suppose they were, in all respects, like a promissory note, indorsed after it was due? What would be the legal consequence? Such an instrument does not cease to be negotiable when it is past due and unpaid. It is now settled,* both in England and in this court, as we have seen, that circumstances which would have put a prudent man upon inquiry, are not enough to affect the title of a *bonâ fide* holder for value. And there is not, and cannot be, the slightest imputation to Mr. Hardenberg of *mala fides*. The most that can be said of the fact, apparent on the face of a negotiable instrument, that it is overdue, is that it implies, *primâ facie*, that the bill or note has been *dishonored;* that the maker or acceptor (the party primarily liable) refuses to pay.

In point of fact, in the case at bar, no such thing is pretended. On the contrary, the whole ground for the suit, which is an invocation of the equity powers of the court, is that the maker, the United States, will certainly pay the bonds to the holder, according to the face and tenor thereof, unless the court will interfere and forbid such payment. It is not perceived how such a fact could have any such significance upon the question, whether the *holder* is, as his possession imports, really *the owner;* and that is the principal question made by the complainant here, upon the *first* proposition above considered.

Nor can it have any significance as to their second proposition, which is in effect the want of consideration for the transfer. At most, the fact of the transfer, when overdue, of a bill or note, is to subject it in the hands of the holder to all *its* equities; to all the equities with which it is incumbered at the time of the transfer.

An original absence of consideration is not one of those equities which attach on the instrument, and defeat the title

* Murray *v.* Lardner, 2 Wallace, 110.

of an indorsee for value of an overdue bill, although with notice of the fact.*

But it is a mistake to say that these bonds were "overdue." It is only necessary to read the bonds themselves, to see that there is no analogy, in this respect, between them and a promissory note, payable to order on a certain day. They were issued as *stock*, not *payable to bearer on any certain day*, but "*redeemable after* fourteen years from their date." They certified that interest would be paid semi-annually for that period; but *thereafter* the bonds might be redeemed by the United States at its pleasure and convenience. The fact that the day had passed *after which* the bonds might be redeemed, and that they had in fact not been redeemed, signified nothing inconsistent with the obligation on its face. The bonds had never been called in. The fiscal condition of the country, and its unsettled political relations with the rebel States, sufficiently explained the fact that they had not been redeemed at the earliest day, when, by their tenor, they were redeemable.

Upon this question of *bona fides*, considerable weight is due to the opinion and action of Mr. Controller Tayler, who upon the whole case, which he necessarily examined, considered that the bonds held by Hardenberg ought to be paid, and who in fact did pay them.

*Messrs. Paschall and Merrick, contra.*

The CHIEF JUSTICE delivered the opinion of the court.

It is asserted, in behalf of Hardenberg, that he can, in no event, upon the pleadings in this suit, be held to account for the proceeds of the bonds which came to his possession, because the bill prays only relief by injunction against receiving payment of the bonds or coupons, and by decree for delivery of them specifically to the State.

It is not denied that the bill also prays for such other and

---

* Charles *v.* Marsden, 1 Taunton, 224; Sturtevant & Ford for Manning & Granger, 101; Lazarus *v.* Cowie, 3 Queen's Bench, 459; Stein *v.* Yglesias, 1 Compton, Meeson & Roscoe, 565.

further relief as to the court shall seem just and proper; but it is insisted that there is nothing in the frame of the bill which will support a claim for relief as to proceeds where payment of the bonds and coupons had been actually received before service of process.

It is undoubtedly true that no relief can be granted under the general prayer except such as is agreeable to the case made by the bill.*

And it is plain enough that the principal object of the bill in this case was to prevent the collection of the bonds by the defendants, and to compel the surrender of them to the State of Texas. But there are averments and interrogatories which look to the proceeds as well as to the bonds themselves. For example, it is charged that the bonds were placed in the hands of the defendants holding them, for the purpose of collecting the proceeds from the United States; and again, that the defendants design to collect the proceeds and apply the same to their own use, in disregard of the just rights, and to the great loss and injury of the complainant. And one of the interrogatories requires from each defendant, except White and Chiles, to whom somewhat different interrogatories are addressed, a statement whether any other person is interested in any, and, if any, in which of the bonds, or the proceeds thereof.

It may be admitted that these allegations and interrogatories do not assert the right of the complainant to the proceeds with absolute directness and distinctness. The bill might have been better drawn. But we think it would savor of extreme technicality to refuse to see in the bill enough in relation to the proceeds of the bonds to warrant relief in this respect under the general prayer.

It is proper to observe here that this objection to relief, in respect to the proceeds of the bonds, was not taken on the former hearing, and that the decree heretofore made distinctly finds that the State of Texas is entitled to restitution of such of the bonds, and coupons, and proceeds as have

---

* Story's Equity Pleading, § 40; English *v.* Foxall, 2 Peters, 595.

come into the possession or control of the defendants—among whom Hardenberg is expressly named—with notice of the equity of the State. It might well be held, therefore, that this question is concluded by the former decree; but willing to allow this defendant the benefit of any defence consistent with the rules which govern proceedings in equity, we have looked into the question as if it were still open. Having thus looked into it, we find no sufficient ground for altering the conclusion embodied in the decree.

We come then to the real question upon which further hearing was allowed, namely, what was the nature and effect of the payment received by Hardenberg from the Secretary of the Treasury, before service of process in this suit?

The bill was filed on the 15th of February, 1867, in pursuance of leave granted by the court. On the same day a motion for injunction was made, and it was ordered that this motion be set down for hearing on the 2d of May, 1867, and that copies of the order be served on the defendants at least ten days previously. Process was ordered, and subpœnas were issued on the same day, and copies of the subpœna and of the motion for injunction were served on Hardenberg on the 27th of February. The answer of Hardenberg was filed May 15th, and on the following day the motion for injunction was allowed, with leave to defendants to move for its dissolution at the next term.

In the interval between the filing of the bill and the service of process, as Hardenberg avers in his answer, the Secretary of the Treasury ordered the payment to him of all his bonds and coupons deposited for redemption, being the same bonds and coupons alleged in the bill to be the property of the State of Texas, and they were paid accordingly on that day.

What was this payment? On the 17th of December, 1866, Hardenberg had been advised by Controller Tayler that payment was delayed for information from Texas. On the 8th of February he was further advised by the same official that the bonds and coupons had been reported to the Sec-

retary of the Treasury for payment, but that payment had been postponed in consequence of a personal action in the name of the State of Texas against the secretary for their detention.

It is clear that Hardenberg was now informed that the bonds and coupons, deposited by him for redemption, were claimed by the State of Texas.

Subsequently, on the 16th of February, thirty-eight thousand two hundred and fifty dollars, being the amount of the bonds and coupons, was paid to the agent of Hardenberg in a coin check, and at the same time treasury 7-30 notes to the amount of fifty-five thousand dollars were deposited with Controller Tayler, according to his statement, made in a letter to the agent, dated February 19th, "as indemnity for Mr. McCulloch" (the Secretary of the Treasury) "against any personal damage, loss, and expense in which he might be involved by reason of the payment of the bonds."

This payment was made on the day after the bill of the State was filed in this court and subpœnas issued. That the institution of the suit, thus begun, was known to the secretary at the time is apparent from the letter of Mr. Tayler to the Chief Justice, dated January 22d, 1868, in which he says: "In form the bonds were paid; in fact the proceeds have been withheld from Mr. Hardenberg because of the legal proceedings, which the secretary did not desire to defeat."

And all this is still further apparent from a memorandum statement made by Mr. Tayler on the 24th, and handed to one of the counsel in the cause.

These statements Mr. Tayler in his deposition reaffirms; but for additional particulars refers to his letter to the agent, already quoted, and to a letter addressed by him on the same day to the cashier of the First National Bank.

From these letters, this memorandum, and the deposition of Mr. Tayler, we do not think it difficult to collect the substantial facts of the transaction. Hardenberg was naturally solicitous to collect the amount of his bonds and coupons, which had ceased to bear interest; or, at any rate, to make

some arrangement by which the loss of interest pending the liquidation might be avoided. The controller seems to have thought that he was entitled to payment, and the secretary was willing to order payment to be made, but not willing to incur any risk of consequential loss or injury. It was his duty, in any arrangement that might be made, to protect the government, and through the government the parties really entitled to the bonds, as well as himself. And the statements of Mr. Tayler, taken together, satisfy us fully that it was the intention of the secretary, and his own, that these objects should be accomplished.

. With these views it was arranged that Hardenberg should deposit with the controller the 7-30 treasury notes, and receive the amount of the bonds and coupons in coin, as already mentioned. And further, that on the deposit with the controller of fifty-thousand dollars in registered 5-20 bonds upon the same trust, the 7-30 bonds should be delivered to him or his agent.

That this arrangement was carried into effect appears from Mr. Tayler's letter of March 2d, 1867, addressed to Hardenberg's agent at New York. The letter concludes with these words: "The bonds are registered in my name as trustee, and carry interest from January 1, 1867."

Trustee for whom? Equity looks through forms to substance; and the substance of this transaction clearly was the substitution of one set of securities in the hands of the Controller of the Treasury for another, for the benefit of the parties really entitled. In no other way could the object of the trust, namely, the security of the government and the secretary against loss, be attained. At the beginning, he held bonds or coupons of the United States issued as indemnity to Texas. At the end, he held registered bonds of the United States in their place. And he held both for Hardenberg, subject to the same equities. The net result of the transaction to Hardenberg was the putting of the debt in a shape to bear interest. If the coin received for the indemnity bonds exceeded the amount invested in the 5-20 bonds deposited in their stead, he may have also gained that excess.

In this view of the case, it is not important to inquire whether the delivery of the coin check to Hardenberg took place before or after the service of process. That transaction was correctly described as "a payment in form," the proceeds having been, in fact, withheld. It was not designed, on the part of the Secretary of the Treasury, to defeat the legal proceedings already commenced by filing the bill and issuing the subpœnas in the cause. We will not presume that any one else entertained such a design. Certainly no such effect, if designed, can be accomplished through the aid of a court of equity. We are obliged, therefore, to say that the delivery of the coin check to the agent of Hardenberg was not payment. There was, indeed, no real payment at all. There was a transaction beginning with the delivery of the coin check, and ending with the substitution of the 5-20 bonds in place of the indemnity bonds, which was to be perfected into actual payment by the delivery to Hardenberg of the substituted bonds whenever this could be safely done. During the progress of this transaction, process in this suit was served on Hardenberg. No real payment, therefore, was made before service of process.

Our conclusion on this part of the case is, that the so-called payment on the 16th of February, 1867, did not affect the equities of the complainant, except by transferring them from the indemnity bonds to the 5-20 bonds substituted in their place, so far as may be necessary to satisfy to the complainant the amount then due upon the former.

This conclusion leaves but one question for consideration, namely, whether Hardenberg, at the time he purchased the bonds, had notice of the equity of the State of Texas? This question was not concluded by the decree, but it was fully considered by the court upon the former argument, and our conclusion was stated in the opinion then delivered, that Hardenberg, as well as the other purchasers of indemnity bonds about the same time, was affected by such notice. We will not restate what we then said. It is only necessary

to say that we have reconsidered the grounds of that decision, and are still satisfied with it.

It follows that, upon the whole case, our decree must be for the complainant as to the bonds claimed by Hardenberg.

STRONG and BRADLEY, JJ., had not yet taken their seats when this case was adjudged.