CRAWFORD and others, by their Next Friend, *v.* MOORE and another.[1]

(*Circuit Court, W. D. Michigan, N. D.* September, 1886.)

1. EQUITY—PLEADING—VARIANCE.
    The rule that proof and pleadings must correspond is to be applied equitably, and not rigidly, especially when the party claiming its benefit is in full possession of the facts, and therefore not misled by a pleading which although inaccurate in some details, yet contains sufficient averments to support the relief prayed for.

2. COVENANT—COVENANTS OF SEIZIN AND GENERAL WARRANTY.
    A deed with covenants of seizin and general warranty of land, to which the grantor has no title, is good in equity as a contract for a conveyance, and title afterwards acquired by the grantor inures to the benefit of the grantee or his heirs.

3. FRAUDULENT CONVEYANCE—CASE STATED.
    A. conveyed to Z. an undivided one-sixth interest in mineral lands which he had discovered, the deed for which had been made to K., who paid the

[1]Reported by J. C. Harper, Esq., of the Cincinnati bar.

purchase money. There was an understanding between K. and A. that the latter should have an interest in the lands for his services, but there was no formal or written contract,—nothing upon which specific performance could have been decreed. Subsequently, at A.'s request, and in consideration of said services, K. conveyed a one-third interest in the lands to B., A.'s wife. She had full notice of the deed to Z., and the conveyance was made to her because of the deed to Z., and to avoid trouble on account of it. *Held,* that such conveyance was in fraud of Z.'s rights, and that B. must convey the undivided one-sixth interest to Z.'s heirs.

4. WITNESS—INCOMPETENCY—STATE AND FEDERAL STATUTES.

Defendant, under the state statutes, would be incompetent to testify, the complainants claiming under a deceased person; but *held,* that the federal courts are controlled by section 858, Rev. St. U. S., under which he is competent.

5 CONTRACT—RESCISSION.

Under the facts disclosed by the proof, the court held that no contract of rescission of the sale by A. to Z. had been proved.

6. PRINCIPAL AND AGENT—SURRENDER OF NOTE—RATIFICATION.

An unauthorized surrender of a note to its maker does not relieve him from liability to pay it; and the payee cannot ratify the surrender because the parties making it had no authority to make the surrender, and did not in making it even profess to act for the payee.


In Equity.

*C. B. Grant* and *T. L. Chadbourne,* for complainants.

*Ball & H. nscom,* for defendants.


SAGE, J. The bill is filed to compel the conveyance to the complainants, the widow and minor children of John Monroe, deceased, of the one undivided sixth part of 160 acres of mineral lands situate in Ontonagon county, Michigan, and located and entered by the respondent Nathaniel D. Moore, upon whose application the patent was issued from the state land-office at Lansing, in January, 1875, to James H. McDonald and John McKay, who furnished the purchase money under an arrangement or understanding that Moore was to have an undivided interest in consideration of his services in exploring the land, and discovering upon it indications of iron ore. This arrangement was altogether oral. One witness testifies that it was reduced to writing, and signed, but that is denied by the parties to it, and his testimony does not contain any definite statement of the contents of the writing. The arrangement was so loose and indefinite in its terms that, aside from any objection resting upon the statute of frauds, it would not have warranted a decree for specific performance. Whether Moore was to have one-third or one-fourth interest in the lands does not clearly appear. There seems to have been nothing more than a mutual understanding that McDonald and McKay would do "what was right;" having reference to a recognized custom to give to "explorers" one-fourth, one-third, or, in some cases, one-half, interest, in the lands located by them.

On the eighteenth day of October, 1875, Moore, who was then unmarried, executed and delivered to John Monroe a deed in fee-simple, with covenants of seizin, against incumbrances, and of general war-

ranty, for an undivided one-sixth interest in said lands, and the deed was duly recorded December 20, 1875. The consideration for this deed was $250, of which Monroe paid $10 in cash, and for the residue gave his promissory note to Moore, payable one year after its date. At the time of the execution of this deed Moore told Monroe that he had not received his deed from McDonald and McKay, but expected to receive it, and that it was probably made out then.

In 1875 or 1876, at what precise date does not appear, a deed from McDonald and McKay and their wives to Moore, for an undivided one-third interest in the land, was drawn, signed by McKay, and left by him with a Mr. Viele, under instructions not to deliver it to Moore without orders from him, (McKay.) This deed was not signed by Mrs. McKay, and it is not clear that it was executed by McDonald and wife, although the fair inference is that it was; but McDonald directed McKay not to deliver the deed to Moore until he heard further from him. No further directions were ever given. Moore was indebted to McDonald, whose intention it was to keep back the deed until he was paid. He had no knowledge of the drawing of the deed, nor of its partial execution. It was never delivered to him, and the testimony is that it has been lost, or, rather, that Viele (who is not a witness) stated that he had lost it. In December, 1880, McDonald and McKay conveyed an undivided one-third interest in the land to the respondent Helen Moore, wife of the respondent Nathaniel D. Moore. This conveyance was made at Moore's request, in discharge of the original arrangement or understanding; no consideration, excepting one dollar, passing at the time. Mrs. Moore was not present at the time of the execution of this deed, but she had been informed by her husband that it was to be made to her, and had full notice of his deed to Monroe. Moore did not have the deed made to himself, because of his deed to Monroe, who died intestate, in Colorado, in August, 1878; and because he had learned that that deed had been recorded, and, as he himself testifies, he expected that Mrs. Monroe would make trouble.

The complainants aver in the bill that McDonald and McKay held the legal title to the land,—one undivided third thereof in trust for Moore under an arrangement made by and between them and Moore at or before the time when they acquired their title; and that, in order to execute said trust, and vest the title to his third in Moore, they, with their wives, at some time between January, 1875, and March, 1881, executed and delivered to him, at his request, a deed of conveyance therefor; that said deed was suppressed or destroyed by Moore and wife, who also procured the deed to Mrs. Moore for the purpose of cutting out complainants' title to said one undivided sixth of said land. The prayer of the bill is that Mrs. Moore be compelled to convey to them the one undivided sixth of said lands, in the proportion to which they are entitled as heirs of Monroe, and for such other and further relief as may seem meet and proper.

By amendment the complainants allege and charge that said conveyance by McDonald and McKay and their wives to Mrs. Moore was made at the instigation of Moore, with intent and purpose to defraud complainants out of the estate conveyed by Moore to Monroe, by lodging the apparent legal title in her, but for his benefit or use. They charge that, in equity and good conscience, the transaction is as if the conveyance had been made direct to Moore, and that he and his wife are estopped by his conveyance to Monroe from asserting or claiming any title to said one undivided sixth, the title to which is in them by virtue of the premises. They further allege that Moore was unmarried when he made his conveyance to Monroe, and that Mrs. Moore took the conveyance to her, for which she paid no consideration, with full notice and knowledge of complainants' rights under the deed from Moore to Monroe.

Counsel for respondents insist that the complainants have failed to make out the case stated in the bill, which they contend rests upon the averments of a trust in McDonald and McKay in favor of Moore; its execution by making and delivering to him a deed, afterwards suppressed or destroyed, whereby, and by reason of Moore's deed to Monroe, the legal title to an undivided one-sixth interest passed to the complainants; and that, inasmuch as the proof negatives these averments, the bill must be dismissed for want of averments to support the case attempted to be made from the proofs at the hearing.

The rule that the proof and the pleading must correspond, is a familiar one, but it is to be applied equitably, and not rigidly; especially when it is appealed to on behalf of a party having all the time of the progress of the cause the facts in full possession, and therefore not misled by a pleading which, although inaccurate or mistaken as to some of the details, yet contains averments sufficient to support a claim for the relief prayed for. *Texas* v. *Hardenberg*, 10 Wall. 68, cited by defendant's counsel, is in point. There it was asserted on behalf of the defendant that, upon the bill, which was for an injunction to restrain the defendant from asking payment of certain bonds of the United States belonging to the complainant, but in the possession of the defendant, he could in no event be held to account for the proceeds of the bonds; the prayer of the bill being only for relief by injunction against receiving payment of the bonds or coupons, and by decree for delivery of them, specifically, to the complainant. Chief Justice CHASE, in his opinion, said it was plain enough that the principal object of the bill was to prevent the collection of the bonds by the defendants, and to compel the surrender of them to the state of Texas; but that there were averments and interrogatories looking to the proceeds as well as to the bonds themselves. Admitting that the allegations and interrogatories did not assert the right of the complainant to the proceeds with absolute directness and distinctness, he adds: "The bill might have been better drawn; but we think it would savor of extreme technicality to refuse to see in the bill enough,

in relation to the proceeds of the bonds, to warrant relief in this respect, under the general prayer." So, in this case, the main object of the bill is to enforce the alleged trust by compelling a conveyance from the fraudulent grantee of the trustees; but there is enough in the bill and the amendment to warrant relief, without reference to the trust, if the averments are sustained by the evidence.

It is next urged on behalf of the defendants that Moore's deed to Monroe did not vest in him any equitable interest in the land for the following reasons:

1. Because of the failure to prove a written agreement between Moore and McDonald and McKay for Moore's interest, and therefore Moore had no equity which he could convey to Monroe. Section 6179, How. St. Mich., provides that no trust or power over or concerning lands, or in any manner relating thereto, shall be "created, granted, assigned, surrendered, or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same, or by some person thereunto by him lawfully authorized by writing." This proposition of law is undoubtedly correct.

2. Because section 5569 of Howell's Statutes provides that no trusts shall result from the payment of the consideration by one person for a grant made to another. But independent of the statute, and under the general doctrine of resulting trusts, no trust resulted in favor of Moore from the fact of his purchasing the land, and taking the title in the name of McDonald and McKay. Aside from the consideration suggested, that he waived his equity, if he had any, by himself causing the patent to be issued to them, his services in exploring the land formed no part of the consideration of the deed from the state. That was exclusively a money consideration, wholly furnished by the grantees. Moore had nothing but an oral agreement for an interest in the land in consideration for his services. Even conceding that his communication to McDonald and McKay of his discovery of indications of ore was part performance, the agreement, as has been stated, was too indefinite to be enforced.

3. That if Monroe acquired no equities in the land by his deed, if McDonald and McKay held the land free from all equities and incumbrances, their grantee, Mrs. Moore, will so hold it, regardless of notice or want of consideration; that the fact of her being married, and being the wife of Moore, does not affect her title. Conceding that she paid nothing for the land, that she was fully advised of all the contract relations existing between her husband and Monroe, and that she took the title at her husband's request, her position is as secure, and her title as free and perfect, as though she were a *bona fide* purchaser for value; that, construed in the most favorable light for complainants, Mrs. Mooore has simply been substituted in the place of McDonald and McKay, and can be held to no other or different trust than that of her grantors.

This is admirably put; but, to get at the real question, it is necessary to take into consideration certain other facts developed by the testimony in connection with those above: (1) That Monroe, by his deed, acquired a strong equity against Moore, who was bound by his covenant to acquire the title if he could do so, not for the benefit of his wife, but for Monroe's benefit. (2) That McDonald and McKay waived the statute of frauds, (which lays it out of this part of the case, so far as everybody else is concerned,) and waived also all defects in the agreement, (which put an end to them;) neither of which, as they testify, they ever thought of relying upon against Moore's claim, which, in the spirit of their understanding that they were to do "what was right," they fully recognized, and, as soon as he had settled his indebtedness to McDonald, were ready and willing to convey to him his one undivided third interest in the land. (3) That Moore thereupon, for the purpose of defrauding Monroe's heirs, (leaving out for the present whether the sale to Monroe had been rescinded,) suggested to McDonald and McKay that the conveyance, for the consideration moving from him, be made to his wife; and that they, as it was a small matter to them whether they deeded it to her or to him,—so McKay testifies,—and on account of their agreement with him,—so McDonald testifies,—at Moore's request, made for the reason that his deed to Monroe had been recorded, that Monroe was dead, and that he expected that Mrs. Monroe would make trouble,—so Moore testifies,—made the conveyance to Mrs. Moore, to whom Moore—as he testifies—had confided a detailed statement of the entire scheme.

Now, add two or three well-recognized propositions of equity, and we shall come to an easy solution of the matter: (1) A deed of conveyance, with covenants of seizin and of general warranty of lands to which the grantor has no title, is good in equity as a contract for a conveyance, and title afterwards acquired by the grantor inures to the benefit of the grantee, or his heirs. (2) Equity looks through forms to substance, and will regard this transaction as if McDonald and McKay had conveyed Moore's interest directly to him, and he then had conveyed it without consideration to his wife; she having notice of the equities in favor of Monroe's heirs. (3) "The court of equity has, from a very early period, decided that even an act of parliament shall not be used as an instrument of fraud; and if, in the machinery of perpetrating it, an act of parliament intervenes, the court of equity, it is true, does not set aside the act of parliament, but it fastens on the individual who gets a title under that act, and imposes upon him a personal obligation, because he applies the act as an instrument for accomplishing a fraud. In this way the court of equity has dealt with the statute of frauds, and in this manner it deals with the statute of wills." Lord WESTBURY in *McCormick* v. *Grogan,* L. R. 4 H. L. Cas. 97. Trusts created by operation of law are expressly excepted from the Michigan statute of frauds, and the

well-understood rule that the statute of frauds is not to be used as a cover for fraud has full play.

It results that whether, by operation of law, Mrs. Moore holds one-half of the one-third interest conveyed to her, in trust for the heirs of Monroe, or whether, by reason of the fraud perpetrated by her husband and herself against the heirs of Monroe, equity imposes upon her a personal obligation, is immaterial. She is in the one predicament or the other. In either case there must be a decree compelling her to convey to them, unless Moore was released from any equitable obligation to Monroe, by transactions relating to the consideration for his deed to Monroe, and subsequent to the execution and delivery of that deed.

This brings us to the branch of the defense next to be considered, which is that the sale by Moore to Monroe was rescinded. This defense, as set up in the answer, is that Monroe paid, upon obtaining his deed from Moore, only $10 in money, giving his note for $240, the remainder of the price agreed upon; that Moore afterwards made an unsuccessful effort to obtain from McDonald and McKay a conveyance of his interest in the land; that at the time Monroe took his deed he gave Moore $150 to enter land for him at the United States land office, if he should know of any that was desirable; that about six months thereafter Monroe, knowing that Moore had not obtained title, told Moore that he did not want an interest in the land, but wanted his note back, and the money he had paid on the land, and also that which he had furnished to enter land, which was still unexpended; that thereupon Moore gave his note for $160, and it was agreed that Monroe should quitclaim to him said land, and that he should cause Monroe's note for $240, which was then in possession of John McKay, a friend of them both, to be surrendered to him; that Monroe soon after went to Colorado, where he died, not having executed such quitclaim; that early in the summer of 1876, and before the death of Monroe, the complainant, Christina Crawford, then Mrs. Monroe, by the direction of her husband, applied to said McKay for said note, claiming that Moore had no title to the land, and that there was no consideration for said note; that McKay, as he had been previously requested by Moore, thereupon delivered the note to her for Monroe, and the same was canceled, and has never been paid; that about a month thereafter Moore paid Monroe the $10 he paid upon said land, and soon afterwards paid the remainder of said note for $160.

No title having passed to Monroe by Moore's deed to him, his rights under it could have been abandoned, or the contract, which the deed in equity imported, could have been rescinded by parol. The statute of frauds does not apply to such a case. *King* v. *Morford*, 1 N. J. Eq. 274; *Maxfield* v. *Terry*, 4 Del. Ch. 618.

An objection was made to the testimony of Moore, who alone testifies to the making of the contract of rescission, and who would be

incompetent, in the state courts, after Monroe's death, to testify in relation to transactions with him. But section 858, Rev. St. U. S., controls, and under that he is clearly competent. His testimony is in conflict with his answer in many respects, and, among them, the following: The $150 was not given him to enter land for Monroe, if he should know of any that was desirable, but for the entry of a specified tract which he told Monroe he had explored, and found it to contain cobalt and nickel, and a trace of tin, and which he assured him would be valuable. His excuse for not entering it is that when he went to the land-office he found that it had already been entered, but he did not advise Monroe of that fact, and he kept the money, which was an act of dishonesty, and a fraud upon Monroe. He fixes the time of making the contract of rescission, not, as in his answer, at about six months after making his deed to Monroe, which was executed October 19, 1875, but in August or September, 1876, which was also after the time when, according to his answer, he had requested McKay to surrender the $240 note. He testifies that Monroe's agreement was not to quitclaim to him the land, as is the averment of the answer, but to send the deed back; that he had not had it recorded. He admits that he did not request or authorize McKay to surrender the $240 note, and that it is not true that within a month he paid Monroe the remaining $10 of the purchase money; and that the note for $160 was not finally paid until in June of 1882 or 1883, six or seven years after it was given, instead of "soon afterwards," as is averred in the answer.

Certain other facts disclosed by the record are pertinent in this connection: (1) In the latter part of 1875, or early in 1876, McKay wrote Monroe, in answer to an inquiry by letter, that Moore had no claim on the property, and no deed for it; that it was owned by McDonald and himself. (2) When Monroe went to see Moore at the time Moore fixes for the contract of rescission, he saw McDonald, who told him that Moore had no interest in the land, and would not have until he paid him. Monroe's answer was that he cared nothing about the land, but he wanted to get his money from Moore, and his visit to Moore, in whom he had evidently, and very naturally, lost all confidence, was to get his money. (3) Moore had at that time sent William McKay, with the $240 note, to Houghton, to negotiate it, that he might raise money. McKay failed to accomplish his mission, and left the note at Hancock with his brother, John McKay, and wife; and Moore not only gave no instructions for the surrender of the note to Monroe, but did not know of its surrender until a year afterwards, when he learned it casually from McKay. (3) Although Moore lived within three or four miles of Monroe until some time in 1878, he never called on him to return the deed, or for a quitclaim. The reason he gives for this is that he thought he had got himself into trouble, and made himself liable, by executing the deed to Monroe, and he "didn't want to stir it up more than was necessary." Ad-

mitting that he supposed if he got the deed back he would thereby be relieved from liability, he flies to the excuse "that the debt was not paid, and he didn't want to urge him until the money was paid in full."

The $160 note matured and was unpaid. Monroe left it with a magistrate for collection, to whom Moore paid small sums, from time to time, amounting in all to about $60, prior to Monroe's death, in 1878, and then paid nothing more until the summer of 1882 or 1883, when the land had been sufficiently developed to make its very great value apparent. His testimony discloses that he and his wife, in June, 1883, conveyed one-half of the interest deeded to her, for the consideration of $20,000, and that he collected the money, and invested a large portion of it in his own name.

In the summer of that year, or of the year preceding, he met Mrs. Monroe, went with her to Ishpeming, to the magistrate who held the $160 note for collection, paid her expenses, and took up the note, by payment, with interest at 10 per cent. from its date; although, according to his own testimony, the note was without interest. He admits that at the time he made this settlement, which, by his own testimony, completed the performance of the agreement of rescission on his part, he said not a word to her about the outstanding deed to Monroe; which, according to his testimony, Monroe was to surrender, and, according to his answer, Monroe was to cancel by a quitclaim. Mrs. Monroe was then living in Canada. The title to the land had been by Moore's manipulations conveyed to his wife. He may have thought the situation reasonably safe, and yet that it was politic to pay the balance due on the $160 note, with something extra in the way of interest, so that Mrs. Monroe would return to Canada, and leave him and Mrs. Moore undisturbed.

The entire series of these transactions has an ugly look, suggesting that Moore had no disposition, in Monroe's life-time, to give up the note, nor pay him what he owed him, and that the story of the agreement of rescission was an after-thought, coined when Monroe was in his grave, and could not deny it.

His testimony is rejected, and the finding is that no agreement of rescission was made.

In the summer of 1876, Mrs. Monroe obtained the $240 note from Mr. and Mrs. John McKay, to whom she stated that her husband sent her for it. They received it from William McKay, to whom Moore had intrusted it for negotiation. Mr. John McKay at first declined to give it to her for the expressed reason that it belonged to Moore, and was not paid; but finally, yielding to her tears and protestations that the note was without consideration, and that the deed from Moore to Monroe was worthless, he handed it to his wife, who was Mrs. Monroe's sister, and she gave it to Mrs. Monroe, who declared that now she had the note she was square with Moore, and he could keep the land. Mrs. Monroe's version is altogether different; but her

testimony is so manifestly unreliable as to be entitled to but little credence.    She took the note home, and gave it to her husband, and he retained it.    After his death it passed into her possession, and it is attached to her deposition.

Monroe's receipt and retention of this note is not a bar to relief to complainants.    It did not relieve him from liability to pay it, nor did it affect Moore's right to collect it, if he had any, because Mr. and Mrs. McKay had no authority, as he himself testifies, to surrender it.   He could not, by ratification, make the surrender his surrender; because they not only had no authority from him, but they did not even profess to act for him.   *Saunderson* v. *Griffiths*, 5 Barn. & C. 909–915; Chit. Cont. (11th Amer. Ed.) 24; Whart. Ag. 662, and cases there cited.

Finally, the defense of laches is not sustained.    Monroe had no equity which he could enforce, so long as the title to the land remained in McDonald and McKay; and they did not convey to Mrs. Moore until in December, 1880, more than two years after his death.

As to the change in the value of the land resulting from its development, it is only necessary to refer to the fact that all the outlay and expense were incurred by the Cambria Iron Company, the lessee. It cost the owners of the land nothing.    There was no unreasonable delay, after the making of the deed to Mrs. Moore, in bringing this suit.

The decree will be for a conveyance to complainants as prayed for, and for rents and profits from the date of filing the bill in the state court from which this cause was removed, against which the amount due on the $240 note will be allowed as a credit.

The circuit judge concurs in the reasoning and conclusions of this opinion.